**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2023 DEC 26  AM 9:02

CLERK

BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| DAN DAVIS and MARY DAVIS, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No.: **2:23-cv-759** |
| v. | ) ) ) | |
| EXACTECH, INC., EXACTECH U.S., INC., TPG, INC., OSTEON HOLDINGS, INC., OSTEON MERGER SUB, INC., and OSTEON INTERMEDIATE HOLDINGS II, INC., | ) ) ) ) ) ) ) | JURY DEMAND |
| Defendants. | ) ) ) | |

---

## COMPLAINT

---

COME NOW Plaintiffs DAN DAVIS and MARY DAVIS ("Plaintiffs"), by and through

the undersigned attorneys, and bring this action against EXACTECH, INC. ("EXACTECH") and

EXACTECH U.S., INC. ("EXACTECH U.S.") (hereafter collectively as "Exactech" or

"Exactech Defendants"), and TPG, INC. (formerly known as both TPG Capital, LP and TPG

Partners, LLC), OSTEON HOLDINGS, INC. (formerly known as Osteon Holdings, LP),

OSTEON MERGER SUB, INC., and OSTEON INTERMEDIATE HOLDINGS II, INC.

(hereafter collectively as "TPG Defendants") for personal injuries suffered as a proximate result

of the bilateral implantation of now-recalled Exactech Optetrak Logic Polyethylene Tibial Inserts

(hereafter as "Optetrak Devices") and allege as follows:

## NATURE OF THE ACTION

1. This is an action for damages relating to Exactech's development, designing, testing, assembling, manufacturing, packaging, monitoring, labeling, preparing, distribution, marketing, supplying, storage, and/or selling of the Optetrak Device.

2. Thousands of patients, like Plaintiff DAN DAVIS have been, and/or will be, required to undergo extensive revision surgeries to remove and replace defective Exactech knee implant devices in connection with a recent recall of these devices which first revealed to patients and surgeons that the polyethylene components within the prosthesis prematurely degrades over time causing an inflammatory response resulting in bone necrosis and osteolysis. The recall notice admits that the recall and problems arose from failure to properly package the ultra-high molecular weight polyethylene ("UHMWPE") insert component of the Optetrak Device.

3. Exactech sold and distributed these defective devices without adhering to the established industry standards for: the processing of UHMWPE, thermal treatment of irradiated UHMWPE, packaging of irradiated UHMWPE, and proper testing of the Devices for oxidation, accelerated wear, and degradation, pitting, and delamination. Additionally, Exactech failed to properly design, manufacture, test, surveil clinical history, and report to regulatory authorities and clinicians failures of its defective femoral components of its Optetrak and Truliant knee systems. See E.B. GAUSDEN, ET. AL., *Mid-term Survivorship of Primary Total Knee Arthroplasty with a Specific Implant*, BONE JOINT J., 105-B(3): 277-283, Mar. 2023. Femoral components that improperly loosen and do not adhere create micromotion and increase risk of higher volumetric polyethylene wear.

4. As explained in detail herein, patients who were implanted with defective Exactech Devices were put at an increased and undue risk of, and have suffered from, adverse

events associated with accelerated wear of the UHMWPE components. Such adverse events include, but are not limited to, inflammation causing bone destruction, implant component loosening, adverse local tissue reaction, excessive fluid buildup causing swelling, implant failure, pain, disabling complications, permanent destruction of the knee bone and muscular structure, permanent alteration of gait, loss of limb, and in some cases death due to complications associated with revision/corrective surgery.

5. As a result of Exactech Defendants' failure to properly package the Optetrak Devices prior to distribution, the polyethylene liners prematurely degraded and Plaintiff DAN DAVIS required revision surgery of both knees due to severe pain, swelling, and instability in the knees and legs. These injuries were caused by early and preventable wear of the polyethylene inserts and resulting component loosening and/or other failures causing serious complications including tissue damage, osteolysis, permanent bone loss and other injuries.

6. Recipients of the Optetrak Device and other Exactech knee implants, like Plaintiff DAN DAVIS, have been required to undergo revision surgeries well before the estimated life expectancy of a knee implant and at a much higher rate than should reasonably be expected for devices of this kind and have suffered pain and disability leading up to and subsequent to the revision surgery.

7. Despite knowledge that the Optetrak Device was defective and resulted in premature failures and accompanying complications, Exactech only first issued a nationwide recall of their implant products on February 7, 2022, advising that "most of our inserts since 2004 were packaged in out-of-specification… vacuum bags that are oxygen resistant but do not contain a secondary barrier layer containing ethylene vinyl alcohol (EVOH) that further augments oxygen resistance."

8. Plaintiffs' claims against TPG Defendants (set forth below), which merged with and took control of Exactech in 2018, are based on theories of successor liability and piercing the corporate veil.

9. As a direct and proximate result of the defective nature of Exactech Defendants' Optetrak Devices surgically implanted in Plaintiff DAN DAVIS which necessitated premature removal, Plaintiff DAN DAVIS suffered and will continue to suffer serious personal injuries, including pain, impaired mobility, rehabilitation, medical care, loss of enjoyment of life, and other medical and non-medical sequelae.

10. Plaintiffs bring this action for personal injuries suffered as a proximate result of failure of the Optetrak Device. Plaintiffs accordingly seek compensatory and punitive damages, and all other available remedies provided to Plaintiffs under the law as a result of injuries DAN DAVIS and MARY DAVIS sustained due to Defendants' negligent, reckless, and wrongful conduct.

## THE PARTIES

### A. Plaintiffs

11. Plaintiff DAN DAVIS is a resident and citizen of Westminster, Vermont.

12. Plaintiff MARY DAVIS is a resident and citizen of Westminster, Vermont.

### B. Exactech Defendants

13. Defendant EXACTECH, INC. is a domestic, Florida corporation with its principal place of business located at 2320 NW 66th Court, Gainesville, Florida 32653. Exactech, Inc. is a citizen of Florida. Exactech, Inc. is a wholly owned subsidiary of Defendant Osteon Holdings, Inc.

14. Defendant EXACTECH, INC. develops, manufactures, packages, stores, distributes, markets, and sells orthopedic implant devices, including Optetrak Devices and

related surgical instrumentation throughout the United States, including in and throughout the United States and the state of Vermont.

15.     Defendant EXACTECH, INC. manufactured the Optetrak Devices implanted in Plaintiff DAN DAVIS.

16.     At all times relevant to this action, Defendant EXACTECH, INC. tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak Devices in interstate commerce and throughout the state of Vermont and generated substantial revenue as a result.

17.     Defendant EXACTECH U.S., INC., a wholly owned subsidiary of Defendant EXACTECH, INC., is a domestic Florida corporation with its principal place of business located at 2320 NW 56th Court, Gainesville, Florida 32653.

18.     According to public filings, Defendant EXACTECH U.S., INC., conducts Defendants' U.S. sales and distribution activities.

19.     EXACTECH U.S., INC. is engaged in the business of designing, developing, testing, assembling, selecting, manufacturing, packaging, labeling, preparing, distributing, marketing, supplying, warranting, selling, and introducing Defendants' products, including Optetrak Devices, into commerce throughout the United States and the state of Vermont.

20.     Upon information and belief, the Optetrak Devices manufactured by Defendant EXACTECH, INC. were distributed by Defendant EXACTECH U.S., INC. throughout the United States, including to Hospital for Special Surgery in New York, New York where Plaintiff DAN DAVIS received his implants.

21.     At all times relevant to this action, Defendant EXACTECH U.S., INC., tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, stored,

promoted, advertised, marketed, distributed, and/or sold the Optetrak Devices in interstate commerce and throughout the state of Vermont and generated substantial revenue as a result.

### C.    TPG Defendants

22.    Defendant TPG, Inc. is a Delaware corporation that has its principal place of business at 301 Commerce Street, Suite 3300, Fort Worth, TX 76102. TPG, Inc. is a citizen of Delaware and Texas. TPG, Inc. was formerly known as both TPG Capital, LP and TPG Partners, LLC (hereinafter collectively referred to as "TPG").

23.    Upon information and belief, TPG Capital, LP converted to TPG, Inc. in or around December 2021.

24.    TPG Partners, LLC converted to TPG, Inc. in or around December 2021.

25.    TPG, Inc. is a publicly traded company on the Nasdaq Stock Exchange with a business model based on privatizing companies.

26.    TPG, Inc. is an alternative asset manager that works with companies in many sectors, including the medical device sector.

27.    The healthcare sector is one of TPG, Inc.'s most active sectors.

28.    As set forth in further detail below, in February 2018, TPG, Inc.'s predecessor entity - TPG Capital, LP - paid over $737 million to merge with Exactech ("2018 Merger").

29.    TPG, Inc. is not a passive investor. It touts its ability to "create products and services [that have] delivered breakthrough innovation" in the healthcare industry, as well as its "unique approach" to "building great companies."

30.    Defendant Osteon Holdings, Inc. is a Delaware corporation that has its principal place of business in Delaware, and is an indirect wholly owned subsidiary or indirect beneficially owned affiliate of TPG, Inc. Osteon Holdings, Inc. is a citizen of Delaware. Osteon Holdings, Inc. was formerly known as Osteon Holdings, LP.

31.     Osteon Holdings, LP converted to Osteon Holdings, Inc. in or around February 2018.

32.     Defendant Osteon Merger Sub, Inc. is a Texas corporation that has its principal place of business in Florida and is a wholly owned subsidiary of Osteon Holdings, Inc. Osteon Merger Sub, Inc. is a citizen of Florida and Texas.

33.     Defendant Osteon Intermediate Holdings II, Inc. is a Delaware corporation that has its principal place of business in Delaware and has been identified in public court filings as the Parent corporation of Exactech, Inc. Osteon Intermediate Holdings II, Inc. is a citizen of Delaware.

34.     At all relevant times, Defendant Osteon Holdings, Inc. (formerly known as Osteon Holdings, LP), Defendant Osteon Merger Sub, Inc., and Defendant Osteon Intermediate Holdings II, Inc. (hereinafter collectively known as "Osteon") have been controlled by TPG, Inc. or its predecessor entities.

35.     Defendants TPG, Inc., Osteon Holdings, Inc., Osteon Merger Sub, Inc., and Osteon Intermediate Holdings II, Inc. are hereinafter collectively referred to as "TPG Defendants."

36.     The following chart demonstrates the relationships between these entities, as described in further detail below:



37.    The TPG Defendants, through and in concert with related entities TPG Partners VII, LP, TPG Genpar VII, LP, TPG Genpar VII Advisors, LLC (collectively TPG Fund Entities), exercised control over the merger with Exactech and subsequent operations of Exactech for their direct benefit and they used Exactech to engage in improper conduct as outlined herein and caused harm to Plaintiffs through such improper conduct.

38.    The TPG Defendants used Exactech as an agent, alter ego, and mere instrumentality such that the TPG Defendants maintained control over Exactech. Moreover, Exactech and the TPG Defendants should be held jointly and severally liable.

### JURISDICTION & VENUE

39.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of

interest and costs, and because there is complete diversity of citizenship between Plaintiffs and all Defendants.

40. Exactech Defendants are subject to personal jurisdiction in the state of Vermont because at all relevant times, they have engaged in substantial business activities in Vermont. At all relevant times, Exactech Defendants transacted, solicited, and conducted business in Vermont through their employees, agents, and/or sales representatives, and derived substantial revenue from such business in Vermont. Exactech Defendants' contacts with the state of Vermont are sufficient to confer personal jurisdiction over them to the full extent of the Constitution and applicable law.

41. TPG Defendants are subject to personal jurisdiction in the state of Vermont because at all relevant times, they directly or indirectly through agents, alter egos, instrumentalities, engaged in substantial business activities in Vermont, including transacting, soliciting, and conducting business in Vermont and TPG Defendants' employees and agents, and derived substantial revenue from such business in Vermont. Furthermore, as set forth above and below, because TPG, its related entities, and Exactech served as agents, alter egos, and instrumentalities for each other, each entity's contacts are attributable to the other entities for purposes of establishing personal jurisdiction.

42. Additionally, as set forth herein, Exactech Defendants and TPG Defendants are national companies that have significant contacts in each state, including the state of Vermont, such that personal jurisdiction is proper in the forum state. Defendants have each derived substantial revenue from the sale of Exactech devices in Vermont.

43. Venue is proper in the District of Vermont pursuant to 28 U.S.C. § 1391 because Plaintiffs are citizens and residents of Windham County, Vermont, and a substantial part of the

-9-

events or omissions giving rise to the claim occurred, including that DAN DAVIS resides and damages accrued, in this district.

## FACTUAL BACKGROUND

### A. LIST OF NON-PARTY INDIVIDUALS RELEVANT TO EXACTECH'S HISTORY, MERGER WITH TPG DEFENDANTS, AND PLAINTIFFS' CLAIMS

44. The following list provides information and background regarding non-party individuals referenced throughout this Complaint that are important to Exactech's history, merger with TPG Defendants, and Plaintiffs' claims against Defendants.

45. Dr. William "Bill" Petty is an orthopedic surgeon and was an original founder of Exactech. Dr. Petty served as Exactech's CEO from 1985 until 2014, after which he served as the Executive Chairman and Chairman of the Board of Exactech, Inc. prior to the 2018 merger. Following the 2018 Merger, Dr. William Petty held the same position and later became the Vice Chairman and a Director.

46. Betty Petty is the wife of Dr. William Petty and is an original founder of Exactech. She served in the dual capacities of Human Resources Coordinator and Director of Marketing Communications from the founding of Exactech until 2001. She was Vice President, Human Resources from February 2000 until May 2010. Ms. Petty also served as the Vice President, Administration and Secretary of Exactech, Inc. prior to the 2018 Merger. Following the 2018 Merger, Betty Petty served as Secretary for one year and then Vice President, Administration for one year.

47. Gary J. Miller, Ph.D. is an original founder of Exactech. Dr. Miller is a biochemical engineer and served as an "innovation leader" since Exactech's inception. Dr. Miller served as Exactech's Executive Vice President, Research and Development prior to the 2018

-10-

Merger. Following the 2018 Merger, Mr. Miller served in numerous capacities, and currently serves as the Executive Vice President of Research and Development Emeritus.

48.    Mr. David W. Petty is the son of Dr. William Petty and Betty Petty. David Petty became Exactech's first employee in 1988. David Petty served as Exactech's Vice President of Operations from April 1991 until April 1993, Vice President of Marketing from 1993 until 2000, the Executive Vice President of Sales and Marketing from February 2000 until December 2007, President from 2007 until 2014, and the CEO from 2014 until January 2020, leading Exactech through the Merger with TPG Defendants. David Petty has been quoted as stating "[t]he secret sauce for Exactech has been the strong patient and people focused culture. . . ." [1]

49.    In January 2020, Exactech announced that Dr. William Petty and his wife, Betty Petty would retire from the company. David Petty was transitioned from his role as Chief Executive Officer to Vice Chairman of the Exactech Board of Directors.

50.    Joel C. Phillips has worked at Exactech since at least 1996 and served as Exactech's Executive Vice President, Chief Financial Officer, and Treasurer prior to 2018. Following the 2018 Merger, Mr. Phillips served for a certain number of years as Exactech's Chief Financial Officer and Treasurer.

51.    Bruce Thompson has been at Exactech since 2004 and served as Exactech's Senior Vice President, Strategic Initiatives prior to the 2018 Merger. Following the 2018 Merger, Mr. Thompson served from 2019 to 2022 as the Senior Vice President, Strategic Initiatives and currently serves as the Senior Vice President, International Sales.

---

[1]  Press Release, Exactech, Exactech Announces Leadership Transition (Jan. 6, 2020), https://www.exac.com/exactech-announces-leadership-transition (last visited Jan. 9, 2023).

52.     Donna Edwards has been at Exactech since 2001 and served as Exactech's Vice President, Legal and General Counsel prior to the 2018 Merger. Following the 2018 Merger, Ms. Edwards served in several roles. In 2019, she served as the Vice President, Legal and from 2020 to 2022, Ms. Edwards served as the Senior Vice President, Legal, Officer. Currently, Ms. Edwards serves as General Counsel and Senior Vice President, Legal.

53.     Christopher Roche was the Director of Engineering for Exactech Inc., prior to the 2018 Merger.  Currently, Mr. Roche serves as Senior Vice President of Extremities at Exactech, Inc.

54.     Steven Szabo was the Vice President of Marketing for Exactech, Inc., prior to the 2018 Merger.

55.     Michael LaGatta was a full-time employee of TPG and many of its subsidiaries and affiliates from approximately 2011 until 2022. For example, Mr. LaGatta has signed agreements on behalf of a number of TPG's subsidiaries and affiliates, including, but not limited to:

   a.     TPG Global, LLC - Vice President

   b.     TPG Holdings, LP - Vice President

   c.     TPG Partner Holdings, LP - Vice President

   d.     TPG Group Advisors (Cayman), Inc. - Vice President

   e.     Osteon Holdings, LP ("Parent") - Vice President

   f.     Osteon Merger Sub, Inc. - Vice President

56.     Jeffrey R. Binder is currently the Chairman and Chief Executive Officer of Exactech, Inc. Since 2015, he has served as a Senior Advisor to TPG.

-12-

57.     Daniel P. Hann has served as Exactech's Senior Vice President, Business Development since 2019.  Mr. Hann has also served as a Senior Advisor to TPG since at least 2017.

58.     Kerem Bolukbasi served as Exactech's Chief Financial Officer and Treasurer from 2020 through August 2022, at which time he was relieved of his duties upon the advice and consent of TPG Board Members.  Prior to assuming his role as Chief Financial Officer and Treasurer of Exactech, Inc., Mr. Bolukbasi worked for TPG as a private equity operations executive, providing interim executive leadership and operational support of the management teams and board of directors for TPG portfolio companies. Mr. Bolukbasi also served as a TPG Advisor to Exactech.

59.     Kendall Garrison serves on the nine-member Board of Directors of Exactech, Inc. and is employed by TPG. He joined TPG in 2008 and currently serves as Principal of TPG.

60.     John Schilling serves on the nine-member Board of Directors of Exactech, Inc. and is employed by TPG.  He joined TPG in 2011 and currently serves as Partner, Head of Operations of TPG.

61.     Todd Sisitsky serves on the nine-member Board of Directors of Exactech, Inc. and is employed by TPG.  He joined TPG in 2003 and currently serves as President and Co-Managing Partner of TPG.

62.     Karen Golz is a member of the Exactech Board of Directors.

63.     Darin Johnson joined Exactech and served as the Vice President of Marketing, Extremities from 2002 to 2016. In this role, he led Exactech's global teams of orthopedic surgeons, product managers, engineers, and sales professionals. In January 2020, Mr. Johnson became Exactech's President and Chief Executive Officer. While he continues to serve as

Exactech's President, in March 2022, following the recalls discussed herein, Mr. Johnson was replaced as Chief Executive Officer by Jeffrey Binder.

### B. EXACTECH'S DEVELOPMENT OF THE DEFECTIVE KNEE IMPLANT DEVICES

64. Throughout the relevant period, Exactech designed, developed, tested, assembled, manufactured, packaged, labeled, distributed, marketed, supplied, warranted, and/or sold total knee replacement systems and components for use in TKAs under the trade names Optetrak Comprehensive Total Knee System, Optetrak Logic Comprehensive Knee System, and Optetrak Comprehensive Total Knee System.

65. The Optetrak Comprehensive Total Knee System was introduced in 1994, the Optetrak Logic Comprehensive Knee System in 2009, and the Optetrak Comprehensive Total Knee System in 2017. The Optetrak knee systems were initially built upon technology licensed from the Hospital for Special Surgery (HSS).

66. At all times material hereto, Defendants designed, developed tested, assembled, selected, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, warranted, and/or sold the Optetrak Device to hospitals in many states, including to Hospital for Special Surgery in New York, New York.

67. These Exactech knee devices feature a mix of polyethylene and metal-based components.

68. Defendants obtained 510(k) clearance from the Food and Drug Administration ("FDA") for various knee system devices and components between 1994 and 2017 including under the names: Optetrak, Optetrak Logic, and Truliant.

69.     510(k) clearance is distinct from the FDA's pre-market approval ("PMA") process in that clearance does not require clinical confirmation of safety and effectiveness and as such the manufacturer retains all liability for the assertions of safety and effectiveness.

70.     510(k) clearance only requires the manufacturer to notify the FDA under section 510(k) of the Medical Device Amendments of 1976 to the Food Device Cosmetic Act (MDA) of its intent to market a device at least 90 days prior to the device's introduction on the market, and to explain the device's substantial equivalence to a pre-MDA predicate device. The FDA may then "clear" the new device for sale in the United States.

71.     All the component parts comprising Plaintiff DAN DAVIS's Optetrak Device were cleared for marketing by the FDA pursuant to 510(k) process or were marketed without receiving either 510(k) clearance or PMA approval by the FDA.

72.     The Optetrak Logic total knee system is classified as a knee joint patellofemorotibial polymer/metal/polymer semi-constrained cemented prosthesis. It features a mix of polyethylene and metal-based components.

73.     According to Defendants, the Optetrak Logic knee system is a "proven design" with "proven materials," and offers "the best of both worlds—a proven design foundation, enhanced by today's most modern surgical technologies."

74.     The Optetrak Logic knee implant is comprised of the following parts: a patellar component, femoral component, tibial insert, and tibial tray, as shown:



75.   The patellar cap and tibial insert are made of polyethylene.

76.   Defendants touted the Optetrak Device as being first-in-class in their product brochures.

77.   In their marketing materials, Defendants promised that knee implants had excellent long-term clinical outcomes, for example, it claims that "surgeons and patients can have every confidence in the performance and longevity of the Optetrak knee system."

78.   Defendants promoted their knee system device as a system with nearly three decades of clinical success and proven outcomes for patients around the world because of an improved articular design resulting in low polyethylene stresses.

79.   However, Exactech Devices, including the Optetrak Device, have performed poorly when compared to its competitors. For example, the Australian Orthopaedic Association, a preeminent, internationally recognized orthopedic implant registry, has identified the Optetrak as an implant with a higher-than-expected rate of revision.

80.   According to the 2020 Australian National Joint Replacement Registry, the rate of revision for a total knee replacement utilizing an Optetrak tibial component with an Optetrak-CR

femoral component was 8.5% at ten years and 10.2% at ten years when implanted with an Optetrak-PS femoral component which far exceeds international guidelines for accepted revision rates.

81.     Per the recommendations established by the International Benchmarking Working Group and applied by the Australian Orthopaedic Association, the Optetrak Devices do not qualify for a "superiority benchmark" or even a "non-inferiority benchmark."

82.     At all times relevant, Defendants have been aware of a high rate of early failures associated with its knee implant, including its Optetrak Device.

83.     Upon information and belief, by 2012, Defendants had further clinical evidence that their knee devices were failing at a rate higher than promoted. Reports in the Manufacturer and User Facility Device Experience (MAUDE) indicate instances of revision due to "loose tibial component," "aseptic loosening," "pain and visible loosening," "polyethylene deformation," "polyethylene worn," and "pain, limited mobility, knee swelling and sensitivity" due to "loose" joint.

84.     Upon information and belief, in 2013, complaints continued to be reported. Some examples include revision for "tibial loosening" just two years postoperatively, "revision due to tibial loosening," "during revision, the tibial component was found to be loose and easily removed," "revision of knee component due to loosening," "revision due to pain and loosening."

85.     Upon information and belief, the complaints of early onset failures continued in 2014. Some examples include "revision due to tibial loosening," "tibial loosening," "revision of Optetrak knee components due to tibial loosening," "revision due to pain and loosening," "revision of Optetrak knee components due to aseptic loosening," several reports described as

"revision of knee components due to tibial loosening," and "revision of Optetrak knee components reportedly due [to] aseptic loosening."

36. The general practice in orthopedic implant surgeries, and with Exactech implants specifically, is for the sales representative of the manufacturer, in this case Exactech's authorized representative and agent, hereinafter "the sales rep," to be present at the time of surgery to provide implant components to the surgeon, relieving the hospital of the responsibility for having on stock all potential sizes and components that may be needed in surgeries. This practice includes the original implant surgery and any revision surgery.

37. The sales reps of Exactech observed many instances of premature failures of the Exactech knee implants with plain evidence upon revision of polyethylene debris that needed to get removed, a/k/a "debrided," visible bone loss, osteolysis, and/or plainly loose components that were easy to remove due to lack of fixation. Often these sales reps would take the component from the surgeon to return to the company for inspection and analysis.

88. The sales reps of Exactech were under a duty to report these findings to the engineering and medical departments of Exactech who were under a duty to then do an investigation, analyze the removed component when available, also known as "retrieval analysis" and honestly and thoroughly report such findings to the FDA and the surgeons.

89. Despite Defendants' knowledge of early onset failures of the Optetrak Device, Defendants continued to manufacture, promote, and distribute the Optetrak Device without alerting surgeons, patients, or the FDA of the potential increased risks of early onset failures.

90. Defendants never changed the labeling, marketing materials or product inserts to adequately and accurately warn patients or physicians of the associated increased risks of early failure due to loosening and/or polyethylene wear.

-18-

91.    Not until August 30, 2021, did Defendants take some action and issue a partial recall of all Optetrak All-polyethylene tibial components, including the OPTETRAK All-polyethylene CC Tibial Components; CPTETRAK All-polyethylene CR Tibial Components; OPTETRAK All-polyethylene CR Tibial Sloped Components; OPTERAK All-polyethylene PS Tibial Components; OPTETRAK HI-FLEX PS Polyethylene Tibial Components; OPTETRAK Logic All-polyethylene CR Tibial Components; OPTETRAK Logic All-polyethylene CRC Tibial Components; OPTETRAK Logic All-polyethylene PSC Tibial Components; OPTETRAK Logic Modular PS Tibial Components; OPTETRAK Logic RBK PS Tibial Components; TRULIANT CR Tibial Inserts; TRULIANT CRC Tibial Inserts; TRULIANT PS Tibial Inserts; and TRULIANT PSC Tibial Inserts.

92.    In issuing the August 2021 recall, Defendants stated "inserts were packaged in vacuum bags that lacked an additional oxygen barrier layer." *See* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfRes/res.cfm?ID=189266

93.    According to the FDA website:

> Exactech began notification to distributors and sales representatives on about 08/30/2021 via letter titled "URGENT MEDICAL DEVICE RECALL." Actions being taken by Exactech included removing all Knee and Ankle UHMWPE products labeled with an 8-year shelf life and not packaged in EVOH/Nylon bags. This will be performed in a phased approach over the next 12 months. Phase 1: immediately return all knee and ankle UHMWPE devices labeled with an 8-year shelf life that will be 5 years old or older by 08/31/2022 not packaged in EVOH/Nylon bags. Phase 2: between 05/31/2022 to 08/31/2022, returning all remaining knee and ankle UHMWPE devices labeled with an 8-year shelf life not packaged in EVOH/Nylon bags.

*id.*

94.    Despite initial communications with distributors and sales representatives, Defendants did not issue any communications to surgeons, who had implanted an Exactech knee

-19-

implant with a recalled polyethylene component, or to patients who had received an Exactech

knee implant with a recalled polyethylene component until months later in February 2022.

95.     On February 7, 2022, Defendants issued an "Urgent Medical Device Correction"

in which it informed health care professionals that:

> After extensive testing, we have confirmed that most of our inserts manufactured since 2004 were packaged in out-of-specification (referred to hereafter as "non-conforming") vacuum bags that are oxygen resistant but do not contain a secondary barrier layer containing ethylene vinyl alcohol (EVOH) that further augments oxygen resistance. **The use of these non-conforming bags may enable increased oxygen diffusion to the UHMWPE (ultra-high molecular weight polyethylene) insert, resulting in increased oxidation of the material relative to inserts packaged with the specified additional oxygen barrier layer. Over time, oxidation can severely degrade the mechanical properties of conventional UHMWPE, which, in conjunction with other surgical factors, can lead to both accelerated wear debris production and bone loss, and/or component fatigue cracking/fracture, all leading to corrective revision surgery.**

*See* Exactech Urgent Medical Device Correction dated February 7, 2022.

96.     The "Urgent Medical Device Correction" went on to further state that Defendants

were expanding the recall to include all knee arthroplasty polyethylene inserts packaged in non-

conforming bags regardless of label or shelf life. The components subject to the recall now

included: OPTETRAK®: All-polyethylene CR Tibial Components, All-polyethylene PS Tibial

Components, CR Tibial Inserts, CR Slope Tibial Inserts, PS Tibial Inserts, HI-FLEX® PS Tibial

Inserts; OPTETRACK Logic®: CR Tibial Inserts, CR Slope Tibial Inserts, CRC Tibial Inserts,

PS Tibial Inserts, PSC Tibial Inserts, CC Tibial Inserts; and TRULIANT®: CR Tibial Inserts,

CR Slope Tibial Inserts, CRC Tibial Inserts, PS Tibial Inserts, PSC Tibial Inserts. *Id.*; *see also*

Exactech Urgent Medical Device Correction dated April 7, 2022 *available at*

https://www.exac.com/wp-content/uploads/2022/04/Exactech-DHCP-letter.4.6.2022.pdf.

97. It is estimated that a total of 147,732 inserts implanted in the United States since 2004 were produced with non-conforming packaging. *Id.*

98. Defendants further acknowledged the original Optetrak knee system has shown statistically significant higher overall revision rates compared to other total knee arthroplasties in the Australian, United Kingdom and New Zealand joint registries. *Id.*

99. Specifically, reasons for revision associated with polyethylene wear, including loosening, lysis, and pain, were increased three-to seven-fold with the Optetrak total knee replacement combination of the Optetrak-PS/Optetrak according to the 2021 Australian National Joint Replacement Registry with revision diagnoses related to accelerated polyethylene wear possibly related to the non-conforming packaging. *Id.*

100. Implanting surgeons were advised in the February 2022 notice to contact patients previously implanted with recalled components and to schedule an evaluation if the patient is experiencing any new or worsening knee swelling, pain while walking, inability to bear weight, grinding or other noise, instability, or any new symptoms of clicking in the knee. *Id.*

101. Furthermore, Defendants advised surgeons that revision surgery should be considered for patients who exhibit premature polyethylene wear. *Id.*

102. Based on Defendants' own representations, since 2004, Defendants manufactured, promoted, and distributed the recalled knee devices without ensuring the polyethylene components were properly packaged to prevent or minimize oxidation. At no point, until August 2021, did Defendants first modify the packaging in an effort to address this defect.

103. In approximately 2017 – 2018, Exactech, Inc. was in the process of being acquired by the Private Equity Group TPG Capital which in February 2018 successfully completed a merger agreement. As a result, TPG acquired all the issued and outstanding

common stock of Exactech. In connection with the transaction, Exactech's founders, CEO, and certain other management shareholders exchanged a portion of their shares in the transaction, for new equity securities in the post-closing ownership of the Company. *See* https://www.exac.com/exactech-announces-completion-of-merger-with-tpg-capital/

104.    Disclosure of knowledge of the improper packaging and excessive premature failure rates could have harmed this transaction.

105.    At all times relevant to this action, Defendants were aware of their knee implants' propensity to undergo substantial early polyethylene wear consisting of the degradation and breakdown of the plastic chemicals causing toxicity to the tissue and bone and component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery and its attendant complications in patients.

106.    At all times relevant to this action, Defendants failed to acknowledge the manufacturing defects in the Optetrak Device due to poor and inadequate quality assurance procedures and due to a wanton and reckless disregard for public safety. Defendants also failed to implement or utilize adequate safeguards, tests, inspections, validation, monitoring, and quality assessments to ensure the safety of the Optetrak Device.

107.    At the time the Optetrak Device was manufactured and sold to patients, including Plaintiff DAN DAVIS, the device was defectively manufactured, packaged, unreasonably dangerous, and did not conform to the federal regulations subjecting patients to unreasonable risks of injury.

108.    At all times relevant to this action, Defendants' inadequate manufacturing processes also led to material flaws in the quality systems at its manufacturing, packaging, storage, and distribution facilities.

109.    During the course of manufacturing and distributing the Optetrak Devices, Defendants failed in several ways, including, without limitation, by:

a.    Failing to conduct adequate mechanical testing, including oxygen-resistance or other wear testing for the components, subassemblies, and/or finished Optetrak Devices;

b.    Failing to test an adequate number of sample devices on an ongoing basis;

c.    Failing to take adequate steps to specifically identify failure modes with clarity and to suggest methods to monitor, avoid, and/or prevent further failures;

d.    Failing to identify and/or note the significance of any testing that resulted in failure of the Optetrak Devices;

e.    Failing to take corrective actions to eliminate or minimize further failures of the Optetrak Devices;

f.    Failing to adequately explain packaging specifications for the components, subassemblies, and/or finished Optetrak Devices;

g.    Failing to perform adequate quality control before the components, subassemblies, and/or finished Optetrak Devices were distributed;

h.    Failing to properly address reports from their sales representatives who reported their observations while attending revision surgeries where

evidence of polyethylene debris and osteolysis was apparent and noted by the surgeons and the sales representatives themselves;

i.    Failing to timely implement corrective action and investigations to understand the root cause of these failures while continuing to sell the components knowing they would be implanted into the bodies of thousands of people; and

j.    Becoming aware of the potential cause or causes but unreasonably avoiding informing patients and surgeons and delaying the ability to minimize damages as the devices continued to degrade and do damage in the patients' bodies.

110.    On or before the date of Plaintiff DAN DAVIS's initial knee replacement surgeries, Defendants knew or should have known the Optetrak Devices were failing and causing serious complications after implantation in patients. Such complications included, but were not limited to, catastrophic polyethylene wear including the deposition of plastic particulate wear debris throughout the knee, a high rate of component loosening, and overall early system failure resulting in tissue destruction, osteolysis, and other injuries causing severe pain, swelling, instability and dysfunction in the knee and leg necessitating revision surgery.

111.    Defendants, as manufacturers of orthopedic devices, know that each surgery, especially a revision surgery, is always more complicated than an initial knee replacement surgery and is fraught with serious risks of infection, anesthesia errors, dislocations, and other serious complications that should be avoided.

112. Defendants, however, ignored reports of early failures of their knee implant devices and failed to promptly investigate the cause of such failures or issue any communications or warnings to orthopedic surgeons and other healthcare providers.

113. In a March 2023 article in THE BONE & JOINT JOURNAL, a report of a study conducted at the Hospital for Special Surgery provided that surgeons at that facility saw "an increase in revision of Optetrak TKAs for aseptic loosening, early and severe polyethylene wear, osteolysis, as well as component loosening related to cement debonding." *See* E.B. GAUSDEN, ET. AL., *Mid-term Survivorship of Primary Total Knee Arthroplasty with a Specific Implant*, BONE JOINT J., 105-B(3): 277-278, Mar. 2023.

114. Before the date of Plaintiff DAN DAVIS's initial knee replacement surgeries, Defendants knew or should have known that the Optetrak Devices were defective and unreasonably dangerous to patients, that the products had an unacceptable failure and complication rate, and that the products had a greater propensity to undergo substantial early polyethylene wear, component loosening, and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

## C.    TPG DEFENDANTS' CONTROL OF EXACTECH

### i.    *TPG Defendants' Control over Exactech*

115. On October 22, 2017, Exactech Inc. submitted a Form 8-K Report to the SEC, reporting that it had entered into an Agreement and Plan for Merger ("Merger Agreement") with Osteon Holdings, LP ("Parent") (now Defendant Osteon Holdings, Inc.) and Defendant Osteon Merger Sub, Inc., a corporation and wholly owned subsidiary of Parent.

116. The October 22, 2017 Report describes the parties to the merger and financing of Defendant Exactech Inc.

117.    The Merger Agreement stated that Defendants Exactech Inc. and Osteon Merger Sub, Inc. will be merged, and Exactech Inc. will be the surviving entity and a wholly-owned subsidiary of Defendant Osteon Holdings, Inc.

118.    Exhibit 10.1 to the October 22, 2017 8-K Report is a letter from Michael LaGatta, setting forth the commitments of TPG Partners VII, LP, to purchase certain equity interests of Parent ("Letter Agreement").

119.    The Letter Agreement was signed by Michael LaGatta on behalf of TPG Partners VII, LP and also "Agreed to and Accepted" on behalf of Parent by Michael LaGatta.

120.    As noted above, Mr. LaGatta was a full-time employee of TPG, who was an active member of numerous subsidiaries and affiliates of TPG, having e.g., signed documents in his capacity as Vice President for TPG Global, LLC, TPG Holdings, LP, TPG Partner Holdings, LP, TPG Group Advisors (Cayman), Inc., Osteon Holdings, LP ("Parent"), and Osteon Merger Sub, Inc.

121.    TPG Capital, LP (now Defendant TPG, Inc.) negotiated the terms of the merger of Exactech, as it controlled Osteon Holdings, LP (now Defendant Osteon Holdings Inc.) and Defendant Osteon Merger Sub, Inc.

122.    TPG Capital LP (now Defendant TPG, Inc.) also organized and directed the financing of the merger of Exactech through TPG Partners VII, LP, which served as the financing entity for the merger and is controlled by TPG, Inc.

ii.    *TPG's Control over Its Affiliates*

123.    Osteon Holdings, LP (the predecessor entity of Defendant Osteon Holdings Inc.) and Defendant Osteon Merger Sub, Inc. are referred to as "Affiliates" of TPG Capital, LP (now Defendant TPG, Inc.) in SEC filings related to the Merger.

124.    Specifically, Exactech, Inc. reported to the SEC that "Parent [Osteon Holdings LP, the predecessor entity of Defendant Osteon Holdings Inc.] and Merger Sub [Defendant, Osteon Merger Sub, Inc.] are affiliates of global private equity firm TPG Capital LP." Exactech, Inc., Current Report (Form 8-K) (Oct. 22, 2017).

125.    Similarly, on December 4, 2017, Exactech reported to the SEC that:

Exactech, Inc., . . . announced today that it has entered into an amendment to its merger agreement with TPG Capital and certain of its affiliates which was previously announced on October 23, 2017.  Pursuant to the amended merger agreement, the Company's common stock outstanding immediately prior to the effective time of the merger . . . will be converted into the right to receive $49.25 per share in cash.  This represents an increase of approximately 17.3% over the $42.00 per share merger consideration previously agreed to by Exactech and TPG Capital. TPG Capital has also increased its equity financing commitment to $737 million for purposes of consummating the merger.

Exactech's Board has approved the amended merger agreement with TPG and has determined that it is advisable, fair to and in the best interest of Exactech and its shareholders.  Exactech's Board hereby recommends to Exactech's shareholders that they vote to approve the merger agreement and the merger with TPG.

TPG has arranged fully committed equity financing for the transaction and there is no financing condition to consummation of the merger with the Company. Early termination of the statutory waiting period under the Hart-Scott-Rodino Act was obtained on November 17, 2017 and, accordingly, there are no anti-competitive or other regulatory approvals needed to consummate the merger with TPG Capital's affiliate.

126.    In a Form 8-K, dated February 13, 2018, filed with the SEC, Exactech, Inc. reported:

On February 14, 2018 (the "Closing Date"), pursuant to the terms of that certain Agreement and Plan of merger, dated as of October 22, 2107 (the "Original Merger Agreement"), as amended by Amendment No. 1 thereto ("Amendment No. 1 to Merger Agreement"), dated as of December 3, 2017 (as to amended, the "Merger Agreement") . . . the Company [Exactech, Inc.] became indirectly beneficially wholly owned by affiliates of TPG Capital (the "TPG Investors") and certain management shareholders of the Company.

127. The Securities Act of 1933 defines an Affiliate as an entity that "directly, or indirectly through one or more intermediaries, **controls or is controlled by**, or is under common control with, the person [entity] specified." 17 C.F.R. § 230.405 Definitions of terms (emphasis added).

128. Osteon Holdings, LP (predecessor entity of Defendant Osteon Holdings, Inc.) and Defendant Osteon Merger Sub, Inc. were the corporate vehicles used by TPG Capital LP (now Defendant TPG, Inc.) to consummate the merger with Exactech, Inc.

129. Both of these entities were affiliates of TPG Capital, LP (now Defendant TPG, Inc.) and, therefore, controlled by TPG Capital, LP (now Defendant TPG, Inc.) under the definition of "Affiliate" as set forth in the Securities Act of 1933.

130. Since Defendant Osteon Merger Sub, Inc. was "merged with and into Exactech, Inc.," Exactech, Inc. is considered an affiliate controlled by TPG Capital, LP (now Defendant TPG, Inc.), pursuant to the merger transaction. TPG Capital, LP (now Defendant TPG, Inc.) accordingly is liable for the improper actions of Exactech that occurred prior to the Merger and also actions that Osteon was aware of and directed subsequent to the Merger.

iii.    *Conversion of Osteon Holdings, LP to Osteon Holdings, Inc.*

131. In connection with the Exactech Merger, on or about October 22, 2017, a Rollover and Voting Agreement was executed, naming William Petty, Betty Petty, David W. Petty, and Prima Investments Limited Partnership (f/k/a Petty Family Investments, LP) as Shareholders in Osteon Holdings, LP.  Osteon Holdings LP was the "Parent" to the Merger.

132. On or about December 3, 2017, an amendment to this Rollover and Voting Agreement, was executed.

133.    As part of the December 3, 2017 amendment ("Amendment 1"), Miller Family Holdings, LLC, Bruce Thompson, Joe! Phillips, Donna Edwards, Chris Roche, and Steve Szabo became shareholders in Osteon Holdings, LP.

134.    According to Schedule A-1 of Exhibit A of the Rollover and Voting Agreement, only those listed on the Agreement, i.e., Exactech pre-merger executives and officers, received subject shares in Osteon Holdings, LP, in exchange for some of their Exactech shares in the Exactech Merger. For example, Dr. William Petty held 102,400 rollover shares in the Exactech Merger, which were exchanged for 5,821,546 shares of Class B common stock of Osteon Holdings LP.

135.    Osteon Holdings, LP was a limited partnership. Under basic tenets of corporate law, Limited Partnerships do not have stock or stockholders. A Limited Partnership has a general partner, who takes unlimited liability for a company's obligations, and one or more limited partners – whose liabilities are limited to the size of their investments.

136.    On or about February 14, 2018, an amendment to the closing Transaction Statement (the "Final Amendment") was executed in connection with the Exactech Merger.

137.    Prior to the execution of the Final Amendment, all original merger agreements and amendments referred to the Parent as Osteon Holdings, LP.

138.    In the Final Amendment, the Parent is no longer referred to as Osteon Holdings LP. Instead, the Final Amendment refers to the Parent as Osteon Holdings Inc.

139.    There is no disclosure explaining why the original Parent company, Osteon Holdings LP was converted to Osteon Holdings Inc.

iv. *TPG Capital, LP's (now Defendant TPG, Inc.) Control over Rollover & Voting Agreement Negotiations with Exactech*

140. During the merger negotiations between April 2017 and December 2017, including various amendments to original agreements, Exactech's Executive Chairman Dr. William Petty and founding shareholders ("the Rollover Investors") "had been approached by and had held discussions with TPG . . . to inquire whether such shareholders would be willing to exchange, in connection with the merger, a portion of their shares of Common Stock for a new class of equity securities in [Osteon Holdings LP]," an affiliate of TPG Capital, LP (now Defendant TPG, Inc.). See Exactech, Inc., Proxy Statement (Form DEF 14A), at 34 (Jan. 16, 2018).

141. "As a condition to receiving new equity securities in [Osteon Holdings, LP], the Rollover Investors have agreed to vote all of their shares of Common Stock [in Exactech] "FOR" the proposal to approve the Merger Agreement and the merger [with TPG Capital, LP (now Defendant TPG, Inc.)]." Id. at 96.

142. "TPG and [its outside Counsel] Ropes & Gray, exchanged seven drafts of the Original Merger Agreement, as well as multiple issues lists, and held multiple telephonic conferences to discuss and negotiate the terms and conditions of the Original Merger Agreement. . ." and reviewed several drafts of the Original Rollover & Voting Agreement ("Rollover Agreement"). Id. at 29-30.

143. As a result of these discussions, Osteon Holdings, LP and the pre-merger Exactech Chairman, founding shareholders and other officers, executed the Rollover Agreement on October 22, 2017, as amended on December 3, 2017.

144. The Amended Rollover Agreement added an "automatic conversion" paragraph that allowed Exactech's Chairman, founding shareholders, and other officers to automatically

convert their individually owned shares in Osteon Holdings, LP "immediately prior to an initial public offering" to shares in an anticipated Initial Public Offering ("IPO") involving TPG Capital, LP, its partners, and affiliates.

145.    TPG, Inc. completed its IPO on January 13, 2022.

146.    Osteon Holdings, LP, a TPG controlled affiliate and party to the Rollover Agreement, had no authority to commit future TPG, Inc. IPO shares through an automatic conversion to Osteon Holdings, LP shareholders. As stated before, Osteon Holdings, LP was converted to Osteon Holdings, Inc.

147.    TPG Capital, LP (now Defendant TPG, Inc.), through its common officers with its affiliates, had the authority to implement the automatic conversion of future shares under the anticipated IPO plan, since TPG, Inc. did not exist at the time the Rollover Agreement was executed.

148.    TPG Capital, LP (now Defendant TPG, Inc.) officers are also officers of Osteon Holdings, LP (now Osteon Holdings, Inc.).  In effect, TPG and its affiliates operate as a single enterprise under the global brand name, "TPG." Furthermore, as demonstrated by the Rollover Agreement and the Exactech January 16, 2018 Proxy Statement, TPG Capital, LP (now Defendant TPG, Inc.) controlled Osteon Holdings, LP (now Osteon Holdings, Inc.) and the negotiations related to the Exactech merger through its common officers, general counsel, and outside counsel.

v.      *TPG's Control over the Management Agreement*

149.    Per the 2017 Amendment to the Rollover and Voting Agreement, Exactech would operate using TPG's "customary management agreement." This management agreement did not require unanimous consent from the Exactech board. This is notable, because as set forth below,

TPG placed many of its own employees on Exactech's Board and in key positions throughout the company.

150. TPG requiring Exactech to use TPG's management agreement demonstrates that TPG has control over the management of Exactech.

151. The 2017 Amendment to the Rollover and Voting Agreement also said that employment agreements with TPG or its affiliates did not require unanimous consent from the Exactech board.

152. TPG requiring control of employment agreements that involve any affiliates demonstrates that it has direct control over employees at Exactech.

vi.    *Co-Mingling Liability*

153. The Merger Agreement demonstrates that the parent company, Osteon Holdings, Inc., assumed certain liabilities of Exactech.

154. The Merger Agreement provides that Defendants Exactech and Osteon Holdings, Inc. will jointly participate in the defense or settlement of any security holder litigation against Exactech or its directors related to the merger.

155. The Merger Agreement provides that Exactech cannot enter into any settlement agreement regarding any securityholder litigation against it or its directors relating to particular transactions without Defendant Osteon Holdings, Inc.'s prior written consent.

156. Defendants Osteon Holdings, Inc., Osteon Merger Sub, Inc., and TPG Partners VII, LP are named as affiliates and grouped together as "the TPG Parties" in the Final Amendment of the SEC Rule 13E-3 Transaction Statement that they jointly filed with Exactech on February 14, 2018.

157. On the SEC's Notice of Exempt Offering of Securities, six directors and seven officers of TPG are listed as "related persons" in connection with Osteon Holdings, LP.

158.    "The TPG Parties," as described in the Final Amendment of the SEC Rule 13E-3 Transaction Statement, should be grouped together for purposes of liability under the Merger Agreement.

159.    The language of the Merger Agreement and SEC filings demonstrates that "the TPG parties" and Exactech co-mingle liabilities, share economic resources, and conduct and manage operations through their common officers and directors.

vii.    *TPG's Post-Merger Control of Exactech*

160.    TPG is not a passive investor in Exactech.

161.    TPG has undertaken active management of Exactech as part of its ownership of the company.

162.    TPG promotes its "distinctive," "alternative," and "unique" approach to growing the companies that it invests in.

163.    Part of TPG's promoted approach is being "involved in building really special companies."

164.    "Building really special companies" requires more than providing money.

165.    Another part of TPG's promoted "unique approach" is bringing a "family office" and "entrepreneurial" perspective to the companies that it partners with.

166.    TPG promotes its ability to "create products and services [that have] delivered breakthrough innovation" in the healthcare industry.

167.    In the healthcare industry specifically, TPG emphasizes its "differential insights."

168.    TPG played an active role in selecting the people who would run the day-to-day operations of Exactech after the merger.

-33-

169.     In meetings during June and July of 2017, TPG told Exactech that it was important for Jeffrey R. Binder (a TPG advisor) to have a central role in any potential transaction between Exactech and TPG.

170.     Jeffrey R. Binder and Daniel Hann both advised TPG Capital on its merger with Exactech.

171.     Jeffrey R. Binder became CEO of Exactech in March 2022 after joining Dr. William Petty as co-executive Chairman of Exactech in 2018.

172.     Daniel Hann became Senior Vice President of Business Development of Exactech.

173.     After an Exactech Board of Directors meeting in September 2017, the company's lead independent director, Mr. James G. Binch, contacted another director, Mr. Todd Sisitsky (TPG President and Co-Managing Partner), to tell him that TPG was now permitted to speak with Exactech's founding shareholders and management team regarding equity participation, employment, and other arrangements for after the merger.

174.     Eleven pre-merger officers or directors of TPG became officers or directors of Exactech post-merger.

175.     TPG advisors have continued to exert direct control over Exactech since the merger.

176.     Defendant Osteon Intermediate Holdings II, Inc. is the certificate holder on a Certificate of Insurance associated with Exactech, Inc. Coverage held by Osteon Intermediate Holdings II, Inc. includes, but is not limited to, products liability.

177. TPG advisers have served in at least six leadership positions for Exactech: three officer positions-filled by Jeffrey R. Binder, Daniel P. Hann, and Kerem Bolukbasi-and three director positions-filled by Kendall Garrison, John Schilling, and Todd Sisitsky.

178. One-third of the nine-member Exactech Board of Directors is composed of TPG employees.

179. As further evidence of TPG's control over Exactech, orthopedic surgeons may be incentivized to utilize Exactech products in exchange for shares of Osteon Holdings, LP. For example, in a 2021 American Association of Hip and Knee Surgeon disclosure report, a Massachusetts-based orthopedic surgeon who is an Exactech "paid consultant" with "IP royalties" disclosed that he has "stock or stock options" in "Osteon Holdings."

viii.    *TPG's Direct Involvement in Decision Making Related to the Recall of Exactech's Hip, Knee, and Ankle Devices*

180. Upon information and belief, TPG advisors and Officers directed the Exactech Hip, Knee, and Ankle Device recalls caused by accelerated polyethylene wear.

181. TPG Officers and Directors are also Officers and Directors of Osteon and Exactech. Therefore, TPG was directly involved in decision making related to the recalls.

182. Upon information and belief, in 2017 or 2018, during due diligence prior to the acquisition of Exactech or shortly after the acquisition of Exactech, TPG knew or should have known of the clinical evidence of early onset failures of Exactech Devices and Exactech's non-compliance with federal regulations and current good manufacturing practices.

183. Public records reveal that Exactech had a history of device failures that may have required a voluntarily recall before the merger and after the merger.

184. Upon information and belief, in order to increase the value of TPG's ownership of Exactech, TPG chose to continue selling Exactech Hip, Knee, and Ankle Devices despite

research and clinical evidence demonstrating significant product defects that were harming patients with those devices implanted in their bodies.

185.    TPG's involvement in Exactech presentations after the merger demonstrates that TPG was aware of the clinical evidence of early onset failures of the Exactech Devices and participated in the corrective action plan.

186.    The first recall of Optetrak devices was not issued until August 30, 2021, over three years after the 2018 Merger.

187.    In November 2021, Exactech CFO and Treasurer Kerem Bolukbasi ("Bolukbasi') gave a "cash flow profile" presentation to the Exactech Board of Directors, including TPG board members and advisors, regarding the August 2021 Exactech recall which "created significant financial difficulty for Exactech . . . reflecting an estimated $60 million cash burn during 2022."

188.    Following this presentation and disclosure Bolukbasi was terminated by TPG and Exactech.

189.    To effectuate Bolukbasi's termination, Darrin Johnson conferred with TPG employee, and Exactech board member, John Schilling.

190.    Also in November 2021, Karen Golz, a member of the Exactech Board of Directors, was appointed to the Board of Directors of another company, iRobot. The iRobot press release announcing Ms. Golz's appointment stated that Ms. Golz also serves on the Board of Directors of "Osteon Holdings/Exactech, a private company controlled by TPG."

191.    At all stages, TPG has been directly involved in and controlled the decision making regarding when and how to recall Exactech's defective Hip, Knee, and Ankle Devices and alert the patients and surgeons to Exactech's years' long failure to manufacture safe devices and comply with good manufacturing practices.

## PLAINTIFF-SPECIFIC ALLEGATIONS

192. On November 6, 2012, Plaintiff DAN DAVIS underwent a total bilateral knee replacement surgery and was implanted with a now-recalled Optetrak Device in each knee at Hospital for Special Surgery in New York, New York.

193. Following these surgeries, Plaintiff DAN DAVIS began experiencing increasing pain, including severe pain at night disturbing sleep, and locking of the knees.

194. Plaintiff was informed that the tibial insert component of his knee implants had been recalled due to out-of-specification packaging, leading to early wear of the plastic Optetrak Devices.

195. Thus, due to this worsening pain and instability caused by the accelerated wear of his recalled Optetrak Devices, diagnosed as "polyethylene wear with osteolysis" and "preoperative stiffness," Plaintiff DAN DAVIS underwent a left knee replacement revision surgery on May 2, 2023 and a right knee replacement revision surgery on October 10, 2023 at Massachusetts General Hospital in Boston, Massachusetts to remove the defective Optetrak Devices.

196. During Plaintiff's left revision surgery on May 2, 2023, Plaintiff's surgeon removed the recalled Optetrak Device and noted "extensive damage along the medial and lateral articular surface consistent with oxidative wear."

197. During Plaintiff's right revision surgery on October 10, 2023, Plaintiff's surgeon removed the defective Optetrak Device and noted "significant delamination along medial and lateral articular surface consistent with oxidative wear."

198. Pathology reports connected with Plaintiff's revision surgeries state that Plaintiff suffered from foreign body giant cell reactions, and the synovial tissue appeared granulomatous.

199.    As outlined above, Defendants, through their affirmative misrepresentations and omissions, actively and fraudulently concealed from Plaintiff DAN DAVIS and Plaintiff's health care providers the true and significant risks associated with the Optetrak Devices and the need to vigilantly do diagnostic testing to promptly diagnose the insidious process of the toxic polyethylene particles degrading and causing osteolysis.

200.    Defendants know that after the one-year checkup following a total knee arthroplasty, patients are not typically expected to return for monitoring absent problems.  Thus, Defendants knew that unless they informed surgeons to call their patients back for periodic radiologic monitoring, polyethylene chemical degradation and attendant osteolysis could be occurring unchecked until it reached the stage of severe bone loss.

201.    As a direct, proximate, and legal consequence of the defective nature of the Optetrak Devices as described herein, Plaintiff DAN DAVIS has suffered and continues to suffer permanent and debilitating injures and damages, including but not limited to, significant pain and discomfort; swelling; impaired mobility; osteolysis; and other injuries presently undiagnosed, which all require ongoing medical care.

202.    As a further direct, proximate and legal consequence of the defective nature of the Optetrak Devices, Plaintiff DAN DAVIS has sustained and will sustain future damages, including but not limited to cost of medical care; rehabilitation; home health care; mental and emotional distress; and pain and suffering.

## TOLLING OF STATUTE OF LIMITATIONS, FRAUDULENT CONCEALMENT, & ESTOPPEL

203.    Plaintiffs incorporate by reference each and every paragraph of this Complaint as if fully set forth herein.

204.    Any applicable statutes of limitations have been tolled by the knowing and active concealment and denial of the facts as alleged herein by Defendants. Plaintiffs have been kept ignorant of vital information essential to the pursuit of these claims, without any fault or lack of diligence on Plaintiffs' part.

205.    Defendants were under a continuing duty to disclose the true character, quality and nature of the Optetrak Devices and components identified herein, to the Plaintiff DAN DAVIS as well as his physicians. Because of their concealment of the true character, quality and nature of the Optetrak Devices to Plaintiff DAN DAVIS, Defendants are estopped from relying on any statute of limitations defense.

206.    As a result of Defendants' unlawful and fraudulent concealment of the effects of the Optetrak Devices, the running statute of limitations has been suspended with respect to claims that Plaintiffs could bring. Plaintiffs had no knowledge of Defendants' unlawful conduct, or any of the facts that might have led to the discovery of Defendants' wrongdoing, until shortly before the Complaint was filed.

207.    The breakdown and wear of polyethylene, a plastic, leads to the release of toxic compounds, including chemical additives and nanoplastics. *See* Rillig, Matthias C. *et al.*, "The Global Plastic Toxicity Debt," *Environ. Sci. Technol.* 2021, 55, 2717-2719.

208.    All plastics contain additional chemicals or additives and may contain impurities such as catalyst residues, unreacted monomers or breakdown products which possess toxic properties that can adversely affect human health. *Id.*

209.    A comparison of muscle tissue from patients implanted with ceramic liners versus polyethylene liners during total hip arthroplasty demonstrated decreased osteolysis and capsule atrophy as well as less structural change to the muscles. *See* Hernigou, Phillippe *et al.*, "Ceramic-

on-ceramic THA Associated with Fewer Dislocations and Less Muscle Degeneration by Preserving Muscle Progenitors," *Clin Orthop Relat Res* (2015) 473:3762-3769.

210.    In patients who develop osteolysis, there is osteolysis-associated reduced bone regenerative capacity with a decrease in mesenchymal stem cells (MSCs) that is accompanied by reduced muscle mass and increased fatty degeneration. *Id.*

211.    For polyethylene implants with resulting osteolysis, a "possible mechanism was evaluated by an experimental study demonstrating that contact PE (polyethylene) particles inhibit the osteogenic activity of osteoprogenitor cells… which may result in reduced periprosthetic bone regeneration." *Id.*

212.    To date, most plastic chemicals remain unknown and the toxic hazards of potentially thousands of chemicals humans are exposed to remain unknown, and thus, unregulated. *See* Zimmerman, Lisa *et al.*, "Plastic Products Leach Chemicals That Induce *In Vitro* Toxicity under Realistic Use Conditions," *Environ. Sci. Technol.* 2021, 55, 11814-11823.

213.    Plastics contain several thousand extractable chemicals which induce *in vitro* toxicity. *Id.*

214.    "Our study highlights that plastic products leach chemicals triggering toxicity… the prevalent antiandrogenicity is an indicator for the leaching of endocrine-disrupting chemicals relevant for human health. Our results also show that many more chemicals are migrating from plastics than previously known." *Id.*

215.    Furthermore, gamma-sterilized ultra-high molecular weight polyethylene contains macroradicals that will react with available oxygen in air or dissolved in bodily fluids.  Kurtz, Steven M., *UHMWPE Biomaterials Handbook*, "Packaging and Sterilization of UHMWPE" (2016).

216. By virtue of Defendants' recall notice and representations on their website, Defendants describe a process by which sterilization of the tibial insert is achieved by gamma radiation in a reduced oxygen environment by use of oxygen barrier packaging. *See* "Optimizing Polyethylene Materials to the Application: When it Comes to Manufacturing Methods, Hips are Not Knees," *available at* https://www.exac.com/optimizing-polyethylene-materials-to-the-application/ (March 14, 2017).

217. "Gamma sterilization… initiate[s] a complex cascade of chemical reactions in the polymer, which ultimately result[s] in oxidation and subsequent degradation of material properties." *See UHMWPE Biomaterials Handbook.*

218. To the extent it is claimed that Plaintiff DAN DAVIS suffered symptoms prior to undergoing revision surgery, the statute of limitations is tolled because development of osteolysis and bone loss are latent conditions caused by years of exposure to the unknown, toxic properties of polyethylene that could not be appreciated until the time of revision surgery.

219. Furthermore, Plaintiff DAN DAVIS exhibited due diligence but did not possess technical, scientific, or medical knowledge and information sufficient to ascertain the cause of his injuries until after Plaintiff received a letter regarding the recall in or about late spring of 2022, which prompted him to visit his provider to inquire if his injuries had been caused by a defective part.

220. Defendants, through their affirmative misrepresentations and omissions, actively and fraudulently concealed from Plaintiff and Plaintiff's healthcare providers the true and significant risks associated with the Optetrak Devices.

221. Following implantation of the Optetrak Devices, Plaintiff DAN DAVIS and Plaintiff's healthcare providers relied on Defendants' continued representations that the Optetrak Devices had excellent long-term clinical outcomes.

222. Defendants made these representations with knowledge of their falsity given their knowledge of reports of high failure rates.

223. As early as 2007, the Australian Joint Registry identified Exactech Optetrak knee replacement devices as having a higher than anticipated rate of revision.

224. According to the Australian Joint Registry published in 2007, use of the Optetrak-PS femoral component with an Optetrak tibial component resulted in a 6.23% revision rate at three years and 6.64% revision rate at four years. The Registry identified use of these components as "Individual Primary Total Knee Prostheses with higher than anticipated revision rates either alone or in combination."

225. The cumulative rate of revision with use of the Optetrak-PS femoral component and an Optetrak tibial component continued to increase. Data from the 2008 and 2009 Australian Joint Registry demonstrated a revision rate of 6.7% and 7.0% at five years, respectively.

226. By 2010, the use of the Optetrak-PS femoral component and Optetrak-PS tibial components were "identified and no longer used" as a result of a 21% cumulative revision rate at five years. This rate increased to 22.7% the following year.

227. Identification of problems with the Optetrak-PS tibial component continued to grow. According to the 2015 registry data, "[t]he Optetrak PS all-polyethylene prosthesis has a cumulative percent revision of 19.4% at seven years."

228. Defendants themselves have acknowledged, "[e]very Exactech Optetrak TKR polyethylene component combination demonstrated statistically significant increased revision

rates compared to other TKR systems," citing 2021 Australian Registry data, however, data demonstrating high rates of premature failure were available to Defendants as early as 2007.

229. Exactech Optetrak devices had similarly high failure rates as documented in the United Kingdom National Joint Registry. In 2015, the revision rate for Exactech Optetrak knee devices was 5.02% at seven years and 6.92% at ten years. In 2016, the revision rate for Exactech Optetrak knee devices was 5.15% at seven years and 7.79% at ten years. In 2017, the revision rate for Exactech Optetrak knee devices was 5.23% at seven years and 7.45% at ten years. In 2018, the revision rate for the Optetrak CR was 5.53% at seven years and 7.61% at 10 years.

230. The failure rates for Optetrak knee replacement devices in the UK Registry were consistently higher compared to other knee replacement devices.

231. Defendants sold these implants worldwide and had a duty to monitor the international registries to assess how their prostheses were faring. Unfortunately, since the United States does not have a single payer health system, there is no national registry and doctors in the Unites States are not privy to nor expected to be aware of such data from other continents.

232. Defendants never informed physicians of the high failure rates associated with the Exactech knee replacement devices reported annually in the international registries.

233. Although clinical evidence demonstrated that their knee replacement devices were failing at a rate higher than promoted with instances of excessive revision rates due to device loosening and polyethylene wear, Defendants failed to initiate a recall earlier or issue any communications to healthcare providers that patients should be monitored.

234. Furthermore, earlier disclosure of these failure rates could have impacted the sale of the company to private equity.

235.    Had Defendants not actively and fraudulently concealed evidence of growing reports of premature device failures, Plaintiff DAN DAVIS would have obtained radiological intervention at an earlier time.

236.    Such intervention would have led to an earlier diagnosis of bone loss and earlier removal of the Optetrak Devices thereby reducing damage to bone and tissue.

237.    As a result of Defendants' actions, Plaintiff DAN DAVIS and Plaintiff's healthcare providers were unaware, and could not have reasonably known or have learned through reasonable diligence, that Plaintiff DAN DAVIS had been exposed to the risks identified herein, and that those risks were the result of defects in the product due to Defendants' acts, omissions, and misrepresentations.

238.    Accordingly, no limitations period ought to accrue until such time as Plaintiffs knew or reasonably should have known of some causal connection between Plaintiff DAN DAVIS being implanted with the Optetrak Devices and the resulting harm later suffered by Plaintiffs as a result by reason of Defendants' fraudulent concealment.

239.    Additionally, Defendants are equitably estopped from asserting any limitations defense by virtue of their fraudulent concealment and other misconduct as described herein.

240.    Further, the limitations period ought to be tolled under principles of equitable tolling.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### STRICT PRODUCTS LIABILITY – DEFECTIVE MANUFACTURING

(Against Exactech Defendants and TPG Defendants[2])

---

[2] Plaintiffs' claims against TPG Defendants are based on the general concepts of successor liability and piercing the corporate veil and include without limitation any similar doctrines for imposing liability on affiliated companies that may be available under governing law.

241.     Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

242.     Prior to Plaintiff DAN DAVIS's initial knee implant surgeries, and at all times relevant this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak Devices for implantation into consumers, such as Plaintiff DAN DAVIS, by orthopedic surgeons in the United States.

243.     Defendants had a duty to manufacture the Optetrak Devices in a manner that prevents unreasonable risk of harm or injury to users and patients, including Plaintiff DAN DAVIS.

244.     Defendants had a duty to distribute, market, and/or sell the Optetrak Devices without manufacturing and related packaging defects to prevent an unreasonable risk of harm or injury to users and patients, including Plaintiff DAN DAVIS.

245.     The Optetrak Devices manufactured by Defendants were not reasonably safe for their expected, intended, and/or foreseeable uses, functions, and purposes.

246.     The Optetrak Devices were not reasonably safe as manufactured, packaged, distributed, marketed and/or sold by Defendants.

247.     The defects in manufacture of the Optetrak Devices were a substantial factor in causing Plaintiff DAN DAVIS's injuries.

248.     At all times herein mentioned, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak Devices, which were implanted in Plaintiff DAN DAVIS,

such that they were dangerous, unsafe, and defective in manufacture. The defects in manufacture include but are not limited to:

a.  Failure to package the polyethylene components of the Optetrak Devices in vacuum bags that contain a secondary barrier layer containing ethylene vinyl alcohol (EVOH) as to prevent the components from undergoing increased oxidation and causing patients to experience substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery;

b.  The materials used to package the Optetrak Devices were of an inferior grade or quality;

c.  That the Optetrak Devices as manufactured differed from Defendants' intended specifications;

d.  That Defendants failed to measure and/or test an adequate number of samples of Optetrak Devices on an ongoing basis;

e.  That Defendants failed to take corrective actions to eliminate or minimize further failures of the Optetrak Devices;

f.  That Defendants failed to perform adequate quality control or other such testing on the polyethylene inserts used in the Optetrak Devices to ensure they complied with required specifications and were not prematurely degrading while stored;

g.  Failing to select appropriate third-parties to package the polyethylene inserts used in the Optetrak Devices;

h.  Failing to properly supervise and monitor the packaging of the polyethylene inserts used in the Optetrak Devices;

i.  That Defendants failed to exercise sufficient quality control to ensure the polyethylene inserts in the Optetrak Devices were safe for implantation in users and patients and would not degrade abnormally under average and regular use; and

j.  That Defendants violated applicable state and federal laws and regulations; and in all other ways.

249.  Defendants knew or reasonably should have known and been aware that the Optetrak Devices were defectively manufactured.

250.  The manufacturing defects in the Optetrak Devices existed when the devices left Defendants' control.

251.  Plaintiff DAN DAVIS's physicians implanted the Optetrak Devices in the manner in which they were intended and recommended to be used, making such use reasonably foreseeable to Defendants.

252.  The Optetrak Devices as tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold by Defendants reached Plaintiff DAN DAVIS without substantial change in their condition.

253.  As alleged herein, Defendants knew or had reason to know that the Optetrak Devices caused an increased risk of harm to the Plaintiff DAN DAVIS and other consumers due to the devices' propensity to undergo substantial early polyethylene wear, component loosening, and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

254. The manufacturing defects of the Optetrak Devices presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff DAN DAVIS, when used and operated for the purposes intended by Defendants.

255. The manufacturing defects of the Optetrak Devices presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff DAN DAVIS, when they were used and operated in a manner that was foreseeable to Defendants.

256. Plaintiffs could not, by the exercise of reasonable care, have discovered the manufacturing defect and perceived its dangers or avoided injury.

257. Defendants are strictly liable for the defective manufacture of the Optetrak Devices; the distribution, marketing, and/or sale of the defectively manufactured Optetrak Devices; and the injuries sustained by Plaintiff DAN DAVIS.

258. By reason of the foregoing acts, omissions, and conduct committed by Defendants, Plaintiff DAN DAVIS was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

259. By reason of the foregoing acts, omissions and conduct committed by Defendants, Plaintiff DAN DAVIS was caused to sustain serious personal injuries, conscious pain and suffering, and physical disability that will require continued and additional medical treatment.

260. As a direct, proximate and legal consequence of the defective nature of the Optetrak Devices as described herein Plaintiff DAN DAVIS has suffered and continues to suffer permanent and debilitating injures and damages, including but not limited to, significant pain and discomfort; swelling; impaired mobility; osteolysis; and other injuries presently undiagnosed, which all require ongoing medical care.

261.    As a further direct, proximate, and legal consequence of the defective nature of the Optetrak Devices, Plaintiff DAN DAVIS has sustained and will sustain future damages, including but not limited to cost of medical care; rehabilitation; home health care; mental and emotional distress; and pain and suffering.

262.    Defendants acted intentionally, recklessly, and wantonly without regard for Plaintiffs' rights beyond all standards of decency, entitling Plaintiffs to recover punitive damages.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
## STRICT PRODUCTS LIABILITY – DEFECTIVE DESIGN AND UNREASONABLY DANGEROUS PRODUCTS

(Against Exactech Defendants and TPG Defendants[3])

263.    Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

264.    Prior to Plaintiff DAN DAVIS's initial knee replacement surgeries, and at all times relevant this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak Devices for implantation into consumers, such as Plaintiff DAN DAVIS, by orthopedic surgeons in the United States.

---

[3] Plaintiffs' claims against TPG Defendants are based on the general concepts of successor liability and piercing the corporate veil and include without limitation any similar doctrines for imposing liability on affiliated companies that may be available under governing law.

265. Defendants had a duty to design and package the Optetrak Devices in a manner that did not present an unreasonable risk of harm or injury to users and patients exposed to their danger, including Plaintiff DAN DAVIS.

266. Defendants had a duty to distribute, market, and/or sell the Optetrak Devices with a design that did not present an unreasonable risk of harm or injury to users and patients exposed to their danger, including Plaintiff DAN DAVIS.

267. The design of the v Device and corresponding packaging is defective and not reasonably safe for its expected, intended, and/or foreseeable uses, functions, and purposes.

268. The Optetrak Devices and corresponding packaging are not reasonably safe as designed, distributed, marketed, delivered and/or sold by Defendants.

269. The defective design of the Optetrak Devices and packaging received by Plaintiff DAN DAVIS's implanting surgeon were a substantial factor in causing Plaintiff's injuries.

270. At all times relevant to this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak Devices, which were implanted in Plaintiff DAN DAVIS, such that they were dangerous, unsafe, and defective in design. The defects in the design include but are not limited to:

      a.    That the Optetrak Devices have propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients;

      b.    Failure to design the packaging for the polyethylene components of the Optetrak Devices in vacuum bags that contain a secondary barrier layer

containing ethylene vinyl alcohol (EVOH) as to prevent the components from undergoing increased oxidation and causing patients to experience substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery;

c.     That the materials used within the Optetrak Devices and packaging were of an inferior grade or quality than advertised and promoted by Defendants;

d.     Defendants failed to conduct adequate testing, including wear or other testing, on components, subassemblies and/or the finished Optetrak Devices as packaged and distributed;

e.     Defendants failed to test an adequate number of samples of Optetrak Devices on an ongoing basis;

f.     Defendants failed to take adequate steps to specifically identify failure modes with the Optetrak Devices with clarity and to suggest methods to monitor, avoid, and/or prevent further failures;

g.     Defendants failed to identify and/or note the significance of any testing that resulted in failure of the Optetrak Devices;

h.     Defendants failed to take corrective actions to eliminate or minimize further failures of the Optetrak Devices;

i.     Defendants failed to adequately design packaging specifications for the components, subassemblies, and/or the finished Optetrak Devices;

j.    The polyethylene material used in the Optetrak Devices in conjunction with the inferior vacuum bags caused and/or contributed to the devices having a higher failure rate than other similar devices available at the time the Optetrak Devices were put on the market;

k.    The polyethylene material used in the Optetrak Devices in conjunction with the inferior vacuum bags caused and/or contributed to the devices having a shorter effective lifetime than other similar devices available at the time the Optetrak Devices were put on the market;

l.    Defendants' method of designing the polyethylene insert and packaging increased the risk of users and patients suffering from pain, discomfort, injury and the need for revision surgery; and

m.    That Defendants violated applicable state and federal laws and regulations; and in all other ways.

271.    Defendants knew or reasonably should have known and been aware that the Optetrak Devices and packaging were defectively designed.

272.    The design defects in the Optetrak Devices and packaging existed when the devices left Defendants' control.

273.    Plaintiff DAN DAVIS's physicians implanted the Optetrak Devices in the manner in which they were intended and recommended to be used, making such use reasonably foreseeable to Defendants.

274.    The Optetrak Devices as tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold by Defendants reached Plaintiff DAN DAVIS without substantial change in their condition.

275.    As alleged herein, Defendants knew or had reason to know that the Optetrak Devices caused an increased risk of harm to Plaintiff DAN DAVIS and other consumers due to the devices' propensity to undergo substantial early polyethylene wear, component loosening, and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

276.    The Optetrak Devices and packaging as designed carried risks that were outweighed by any utility of the design of the devices and packaging because when paired together the implant, the Optetrak Devices were dangerous to an extent beyond that which would be contemplated by the ordinary consumer. At no time did Plaintiff DAN DAVIS have reason to believe that the Optetrak Devices and the packaging in which they were received were in a condition not suitable for proper and intended use.

277.    The Optetrak Devices and packaging were defective in design and unreasonably dangerous when they entered the stream of commerce were received by Plaintiff DAN DAVIS, because the foreseeable risks exceeded or outweighed the purported benefits associated with the devices.

278.    Feasible safer alternative designs providing the same functional purpose were available to Defendants at the time the Optetrak Devices were designed and packaged and offered for sale in the market.

279.    For example, Defendants could have utilized vacuum bags containing a secondary barrier layer containing ethylene vinyl alcohol (EVOH) as to prevent the polyethylene components from undergoing increased oxidation according to their own admissions.

280. The design defects of the Optetrak Device and corresponding packaging presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff DAN DAVIS, when used and operated for the purposes intended by Defendants.

281. The design defects of the Optetrak Devices and corresponding packaging presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff DAN DAVIS, when they were used and operated in a manner that was foreseeable to Defendants.

282. Plaintiffs could not, by the exercise of reasonable care, have discovered these design defects and perceived its dangers or avoided injury.

283. Defendants are strictly liable for the defective design of the Optetrak Devices; defective design of the packaging of the Devices; the distribution, marketing, and/or sale of the Optetrak Devices; and the injuries sustained by Plaintiff DAN DAVIS.

284. By reason of the foregoing acts, omissions and conduct committed by Defendants, Plaintiff DAN DAVIS was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

285. By reason of the foregoing acts, omissions and conduct committed by Defendants, Plaintiff DAN DAVIS was caused to sustain serious personal injuries, conscious pain and suffering, and physical disability that will require continued and additional medical treatment.

286. As a direct, proximate, and legal consequence of the defective nature of the Optetrak Devices as described herein, Plaintiff DAN DAVIS has suffered and continues to suffer permanent and debilitating injures and damages, including but not limited to, significant pain and discomfort;

swelling; impaired mobility; osteolysis; and other injuries presently undiagnosed, which all require ongoing medical care.

287.    As a further direct, proximate, and legal consequence of the defective nature of the Optetrak Devices, Plaintiff DAN DAVIS has sustained and will sustain future damages, including but not limited to cost of medical care; rehabilitation; home health care; mental and emotional distress; and pain and suffering.

288.    Defendants acted intentionally, recklessly, and wantonly without regard for Plaintiffs' rights beyond all standards of decency, entitling Plaintiffs to recover punitive damages.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

### THIRD CAUSE OF ACTION
### STRICT PRODUCTS LIABILITY – FAILURE TO WARN

(Against Exactech Defendants and TPG Defendants[4])

289.    Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

290.    Prior to Plaintiff DAN DAVIS's initial knee replacement surgeries, and at all times relevant this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or

---

[4] Plaintiffs' claims against TPG Defendants are based on the general concepts of successor liability and piercing the corporate veil and include without limitation any similar doctrines for imposing liability on affiliated companies that may be available under governing law.

sold the Optetrak Devices for implantation into consumers, such as Plaintiff DAN DAVIS, by orthopedic surgeons in the United States.

291.    Defendants had a duty to provide adequate warnings regarding the Optetrak Devices in a manner that did not present an unreasonable risk of harm or injury to users and patients exposed to their danger, including Plaintiff DAN DAVIS.

292.    Defendants had a duty to distribute, market, and/or sell the Optetrak Devices with adequate warnings that did not present an unreasonable risk of harm or injury to users and patients exposed to their danger, including Plaintiff DAN DAVIS.

293.    The warnings that accompanied the Optetrak Devices and corresponding packaging were defective thereby making the products not reasonably safe for their expected, intended, and/or foreseeable uses, functions, and purposes.

294.    The Optetrak Devices and corresponding packaging are not reasonably safe as labeled, distributed, marketed, delivered and/or sold by Defendants.

295.    Inadequate labeling accompanying the Optetrak Devices and packaging received by Plaintiff DAN DAVIS's implanting surgeon was a substantial factor in causing Plaintiff's injuries.

296.    At all times relevant to this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak Devices, which were implanted in Plaintiff DAN DAVIS, such that they were dangerous, unsafe, and defective.

297.    The Optetrak Devices were defective and unreasonably dangerous when they entered the stream of commerce and were received by Plaintiff DAN DAVIS, because the warnings in the instructions for use, operative techniques, directions, marketing and promotional materials, advertisements, white papers, and other communications provided by Defendants or

their sales force to physicians and patients with or about the Optetrak Devices failed to adequately convey the potential risks and side effects of the Optetrak Devices and the dangerous propensities of the devices, which risks were known or were reasonably scientifically knowable to Defendants.

298. In particular, Defendants failed to adequately disclose the devices' propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, bone loss, osteolysis, and other injuries as well as the need for revision surgery in patients.

299. Defendants consciously disregarded the increased risks of harm by failing to adequately warn of such risks; unlawfully concealing the dangerous problems associated with implantation of the Optetrak Devices; and continuing to market, promote, sell and defend the Optetrak Devices until the very recent recall.

300. Defendants knew or reasonably should have known and been aware that the Optetrak Devices and packaging contained inadequate warnings.

301. The inadequate warnings for the Optetrak Devices existed when the devices left Defendants' control.

302. Plaintiff DAN DAVIS's physician implanted the Optetrak Devices in the manner in which they were intended and recommended to be used, making such use reasonably foreseeable to Defendants.

303. The Optetrak Devices as tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold by Defendants reached Plaintiff DAN DAVIS without substantial change in their condition.

304. As alleged herein, Defendants knew or had reason to know that the Optetrak Devices caused an increased risk of harm to Plaintiff DAN DAVIS and other consumers due to

the devices' propensity to undergo substantial early polyethylene wear, component loosening, and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

305.    The Optetrak Devices labeled, manufactured, distributed, and sold by Defendants to Plaintiff DAN DAVIS were in a defective condition that was unreasonably dangerous to any user or ordinary consumer of the devices, including Plaintiff.

306.    The labeling defects of the Optetrak Devices and corresponding packaging presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff DAN DAVIS, when used and operated for the purposes intended by Defendants.

307.    The labeling defects of the Optetrak Devices and corresponding packaging presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff DAN DAVIS, when they were used and operated in a manner that was foreseeable to Defendants.

308.    Plaintiffs could not, by the exercise of reasonable care, have discovered these defects and perceived the dangers or avoided injury.

309.    Defendants failed to issue new warnings or initiate a recall in a timely manner as to help minimize the damage and bone loss occurring in patients, including Plaintiff DAN DAVIS.

310.    Defendants are strictly liable for providing inadequate warnings accompanying the Optetrak Devices and packaging of the Devices; the distribution, marketing, and/or sale of the Optetrak Devices; and the injuries sustained by Plaintiff DAN DAVIS.

311.    By reason of the foregoing acts, omissions, and conduct committed by Defendants, Plaintiff DAN DAVIS was caused to sustain serious personal injuries, conscious

pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

312.    By reason of the foregoing acts, omissions and conduct committed by Defendants, Plaintiff DAN DAVIS was caused to sustain serious personal injuries, conscious pain and suffering, and physical disability that will require continued and additional medical treatment.

313.    As a direct, proximate and legal consequence of the defective nature of the Optetrak Devices as described herein, Plaintiff DAN DAVIS has suffered and continues to suffer permanent and debilitating injures and damages, including but not limited to, significant pain and discomfort; swelling; impaired mobility; osteolysis; and other injuries presently undiagnosed, which all require ongoing medical care.

314.    As a further direct, proximate and legal consequence of the defective nature of the Optetrak Devices, Plaintiff DAN DAVIS has sustained and will sustain future damages, including but not limited to cost of medical care; rehabilitation; home health care; mental and emotional distress; and pain and suffering.

315.    Defendants acted intentionally, recklessly, and wantonly without regard for Plaintiffs' rights beyond all standards of decency, entitling Plaintiffs to recover punitive damages.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## FOURTH CAUSE OF ACTION
## NEGLIGENCE

(Against Exactech Defendants and TPG Defendants[5])

316.   Plaintiffs incorporate by reference each and every paragraph of this complaint as if set forth herein.

317.   Plaintiffs will show that the serious risk of failure of the Optetrak Devices and other related injuries are the direct and proximate result of breaches of obligations owed by Defendants to Plaintiff DAN DAVIS, including defects in design, marketing, manufacturing, distribution, instructions and warnings by Defendants, which breaches and defects include but are not limited to the following:

a.   Failure to instruct and/or warn of the serious risk of loosening of and failure of the Optetrak Devices resulting in injuries;

b.   Failure to adequately instruct and/or warn healthcare providers, including those healthcare providers who implanted the Optetrak Devices in Plaintiff DAN DAVIS, of the serious risk of loosening of the tibial baseplate and failure of the Optetrak Devices resulting in injuries;

c.   Manufacturing, producing, promoting, creating, and/or designing the Optetrak Devices without adequately testing them;

d.   Failing to provide adequate warning of the dangers associated with the Optetrak Devices;

---

[5] Plaintiffs' claims against TPG Defendants are based on the general concepts of successor liability and piercing the corporate veil and include without limitation any similar doctrines for imposing liability on affiliated companies that may be available under governing law.

e.   The defects in designing, researching, developing, manufacturing, marketing, promoting and selling a medical device when it knew or reasonably should have known of the high risk of loosening and failure;

f.   Defendants' liability under Vermont law as a result of its design, development, manufacture, marketing, labeling and sale of a medical device which is in defective condition and is unreasonably dangerous;

g.   The continued production and sale of Optetrak Devices given the propensity of the medical device to loosen and fail at high rates resulting in subsequent surgery and injuries;

h.   Providing inaccurate labeling and inadequate warnings and instructions with the Optetrak Devices;

i.   Other breaches and defects which may be shown through discovery or at trial; and

j.   Generally, the failure of Defendants to act with the required degree of care commensurate with the existing circumstances.

318.   At all times relevant, Defendants had a duty to exercise reasonable care in the design, manufacture, sale and/or distribution of the Optetrak Devices into the stream of commerce, including a duty to assure that the Optetrak Devices did not pose a significantly increased risk of bodily harm to its users. Defendants breached this duty.

319.   Defendants owed a duty to follow the law in the manufacture, design, testing, assembly, inspection, labeling, packaging, supplying, marketing, selling, advertising, preparing for use, warning of the risks and dangers of the Optetrak Devices, and otherwise distributing the Optetrak Devices. Defendants breached this duty.

320.    Defendants owed a duty of care to provide adequate warnings and instructions to the physicians, providers, suppliers, patients, distributors, or other end users of the Optetrak Devices. Defendants breached this duty.

321.    Defendants performed inadequate evaluation and testing on the Optetrak Devices where such evaluation and testing would have revealed the propensity of the Optetrak Devices to detach, disconnect and ultimately fail causing pain, swelling, instability and other complications and injuries that Plaintiff DAN DAVIS has experienced.

322.    Prior to and after the date of Plaintiff DAN DAVIS's initial knee replacement surgeries in which the Optetrak Devices were implanted, Defendants were on notice that the Optetrak Devices caused serious complications, including the complications that Plaintiff DAN DAVIS suffered here.

323.    Defendants had a duty to perform post-marketing testing of the Optetrak Devices; investigate the root cause of these complications; suspend sales and distribution; and warn physicians and patients of the propensity of Optetrak Devices to fail. Defendants breached this duty.

324.    Plaintiff DAN DAVIS, as a purchaser of two Optetrak Devices, is within the class of persons that the statutes, regulations and obligations previously described herein are designed to protect, and Plaintiff DAN DAVIS's injuries are the type of harm these statutes, regulations, and obligations are designed to prevent.

325.    Defendants knew or should have known that the Plaintiff DAN DAVIS could foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

326.    As a direct and proximate result of Defendants' breaches, Plaintiff DAN DAVIS suffered serious physical and mental injury, harm, damages, including but not limited to past, present and future medical expenses and economic loss and will continue to suffer such harm, damages and economic loss in the future.

## FIFTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

(Against Exactech Defendants and TPG Defendants[6])

327.    Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

328.    Prior to Plaintiff DAN DAVIS's initial knee replacement surgeries, and at all times relevant this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak Devices for implantation into consumers, such as Plaintiff DAN DAVIS, by orthopedic surgeons in the United States.

329.    Defendants owed a duty to orthopedic surgeons, other healthcare providers, and to consumers of the Optetrak Devices, including Plaintiff DAN DAVIS, to accurately and truthfully represent the risks of the Optetrak Devices. Defendants breached their duty by misrepresenting and/or failing to adequately warn Plaintiff's orthopedic surgeon, the medical community, Plaintiff DAN DAVIS, and the public about the risks of the Optetrak Devices, including the devices' propensity to undergo substantial early polyethylene wear, component loosening, and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well

---

[6] Plaintiffs' claims against TPG Defendants are based on the general concepts of successor liability and piercing the corporate veil and include without limitation any similar doctrines for imposing liability on affiliated companies that may be available under governing law.

as the need for revision surgery in patients, which Defendants knew or in the exercise of diligence should have known.

330. Defendants, as the designers, manufacturers, sellers, promoters, and/or distributors of the Optetrak Devices knew, or reasonably should have known, that health care professionals and consumers of the Optetrak Devices would rely on information disseminated and marketed to them regarding the product when weighing the potential benefits and potential risks of implanting Optetrak Devices.

331. Defendants, as the designers, manufacturers, sellers, promoters, and/or distributors of the Optetrak Devices knew, or reasonably should have known, that the patients implanted with an Optetrak Device would suffer early failure and require revision surgery because the information disseminated by Defendants and relied upon by health care professionals and consumers, including Plaintiff DAN DAVIS, was materially inaccurate, misleading, or otherwise false.

332. Defendants failed to exercise reasonable care to ensure that the information they disseminated to health care professionals and consumers concerning the quality and longevity of the Optetrak Device was accurate, complete, and not misleading. As a result, Defendants disseminated information to health care professionals and consumers that was materially inaccurate, misleading, false, and unreasonably dangerous to consumers such as Plaintiff DAN DAVIS.

333. Among Defendants' numerous misrepresentations and misleading omissions are Defendants' assurances that the Optetrak Devices were, safe, had an excellent performance record, and did not have a greater propensity to undergo substantial early polyethylene wear,

component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

334.    Despite their knowledge of serious problems with the Optetrak Devices, Defendants urged their sales representatives to continue marketing the Optetrak Devices, and distributed medical literature, white papers, non-peer reviewed studies, and other communications to surgeons in an effort to mislead them and the general public about the risks associated with the Optetrak Devices and instead create the image and impression that the Optetrak Devices were safe.

335.    Defendants made such statements even after they became aware of numerous and serious complications with the Optetrak Devices. Defendants did not reveal (and instead concealed) their knowledge of numerous and serious complications and other bad data.

336.    Defendants made these representations with the intent to induce reliance thereon, and to encourage purchase and implantation of the Optetrak Devices.

337.    The misrepresentations made by Defendants, in fact were false and known by Defendants to be false at the time the misrepresentations were made.

338.    Misrepresentations spanned a number of years, but also include the critical time period of 2017 – 2018 when the company was in the process of being acquired by the Private Equity Group TPG Capital which in February 2018 successfully completed a merger agreement. As a result, TPG acquired all of the issued and outstanding common stock of Exactech. In connection with the transaction, Exactech's founders, CEO and certain other management shareholders exchanged a portion of their shares in the transaction, for new equity securities in the post-closing ownership of the Company. *See* https://www.exac.com/exactech-announces-completion-of-merger-with-tpg-capital/.

339.    Full disclosure of the magnitude of the problem with the polyethylene failure might have negatively impacted the merger prospects and the merger may have been one of the reasons the problems were concealed.

340.    Nevertheless, after the merger in 2018, it still took four years for Defendants to reveal the product defects and their health consequences to the medical community and to the patients, including Plaintiff DAN DAVIS, even though the key officers of Exactech generally continued with their roles in the newly merged company.

341.    Defendants failed to exercise ordinary care in making their representations concerning the Optetrak Devices and, in the manufacture, sale, testing, quality assurance, quality control, and distribution in interstate commerce of the Optetrak Devices.

342.    By reason of the foregoing acts, omissions and conduct committed by Defendants, Plaintiff DAN DAVIS was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

343.    By reason of the foregoing acts, omissions and conduct committed by Defendants, Plaintiff DAN DAVIS was caused to sustain serious personal injuries, conscious pain and suffering, and physical disability that will require continued and additional medical treatment.

344.    As a direct and proximate result of Defendants' acts and omissions, including Defendants' negligent misrepresentations regarding the Optetrak Devices, Plaintiff DAN DAVIS was implanted with the Optetrak Devices and was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

-66-

345.    As a further direct, proximate and legal consequence of Defendants' acts and omissions, including Defendants' negligent misrepresentations regarding the Optetrak Devices, Plaintiff DAN DAVIS has sustained and will sustain future damages, including but not limited to cost of medical care; rehabilitation; home health care; mental and emotional distress; and pain and suffering.

346.    Defendants acted intentionally, recklessly, and wantonly without regard for Plaintiffs' rights beyond all standards of decency, entitling Plaintiffs to recover punitive damages.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

### SIXTH CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY

(Against Exactech Defendants and TPG Defendants[7])

347.    Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

348.    Prior to Plaintiff DAN DAVIS's initial knee replacement surgeries, and at all times relevant this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak Devices for implantation into consumers, such as Plaintiff DAN DAVIS, by orthopedic surgeons in the United States.

---

[7] Plaintiffs' claims against TPG Defendants are based on the general concepts of successor liability and piercing the corporate veil and include without limitation any similar doctrines for imposing liability on affiliated companies that may be available under governing law.

349. Defendants expressly warranted their knee replacement devices, including the Optetrak Devices, were safe and effective orthopedic devices.

350. Defendants promised that their knee replacement devices had excellent long-term clinical outcomes and that "surgeons and patients can have every confidence in the performance and longevity of the Optetrak knee system."

351. At the time Defendants manufactured, marketed, sold and/or distributed the Optetrak Devices, they knew that the devices were intended for human use, and that Plaintiff DAN DAVIS was a foreseeable user of the Optetrak Devices.

352. The express warranties represented by Defendants were a part of the basis for Plaintiff DAN DAVIS's use of the Optetrak Devices, and he and his surgeon relied on these warranties in deciding to use the Optetrak Devices.

353. At the time of the making of the express warranties, Defendants had knowledge of the purpose for which the Optetrak Devices were to be used and warrantied the same to be in all respects safe, effective, and proper for such purpose.

354. The Optetrak Devices do not conform to these express representations as demonstrated by the fact that Plaintiff DAN DAVIS's implants failed prematurely due to polyethylene wear of the tibial inserts which necessitated him to undergo revision surgery of the knee.

355. At the time Defendants marketed, sold and/or distributed the Optetrak Devices, Defendants expressly warranted that the total knee replacement systems, including all of their component parts, were safe and merchantable for their intended use.

356. Plaintiff DAN DAVIS and his implanting physician reasonably relied upon Defendants' express warranties.

357. Plaintiff DAN DAVIS used the Optetrak Devices for their intended purpose and in a reasonable foreseeable manner.

358. The Optetrak Devices manufactured and sold by Defendants, did not conform to Defendants' express representations because the Optetrak Devices caused serious injury to Plaintiff DAN DAVIS when used as recommended and directed.

359. As a direct and proximate result of Defendants' acts and omissions, including breach of express warranty, Plaintiff DAN DAVIS was implanted with the Optetrak Devices and was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

360. As a further direct, proximate and legal consequence of Defendants' acts and omissions, including breach of express warranty, Plaintiff DAN DAVIS has sustained and will sustain future damages, including but not limited to cost of medical care; rehabilitation; home health care; mental and emotional distress; and pain and suffering.

361. Defendants acted intentionally, recklessly, and wantonly without regard for Plaintiffs' rights beyond all standards of decency, entitling Plaintiffs to recover punitive damages.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## SEVENTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY

(Against Exactech Defendants and TPG Defendants[8])

362.    Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

363.    Prior to Plaintiff DAN DAVIS's initial knee replacement surgeries, and at all times relevant to this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak Devices for implantation into consumers, such as Plaintiff DAN DAVIS, by orthopedic surgeons in the United States.

364.    Defendants impliedly warranted, through their marketing, advertising, distributors, and sales representatives, that the Optetrak Devices were of merchantable quality, and fit for the ordinary purposes and uses for which they were sold.

365.    In fact, the Optetrak Devices were not of merchantable quality nor fit for the ordinary purposes and uses for which they were sold and did not meet the expectations of consumers.

366.    The Optetrak Devices manufactured and supplied by Defendants were not of merchantable quality and were not fit for the ordinary and/or particular purpose for which they were intended, as physicians and patients would expect the components to be properly packaged and stored as to avoid premature degradation of component materials.

---

[8] Plaintiffs' claims against TPG Defendants are based on the general concepts of successor liability and piercing the corporate veil and include without limitation any similar doctrines for imposing liability on affiliated companies that may be available under governing law.

367.    Plaintiff DAN DAVIS and/or his physician reasonably relied upon the skill and judgment of Defendants as to whether the Optetrak Devices were of merchantable quality and safe for their intended and particular use and purpose.

368.    Contrary to such implied warranties, the Optetrak Devices were not of merchantable quality or safe for their intended and particular use and purpose, because Defendants failed to package the polyethylene components of the Optetrak Devices in vacuum bags containing a secondary barrier layer containing ethylene vinyl alcohol (EVOH) as to prevent the components from undergoing increased oxidation and causing patients to experience substantial early polyethylene wear, component loosening, and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery.

369.    As a direct and proximate result of Defendants' acts and omissions, including breach of implied warranties, Plaintiff DAN DAVIS was implanted with the Optetrak Devices and was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

370.    As a further direct, proximate and legal consequence of Defendants' acts and omissions, including breach of implied warranties, Plaintiff DAN DAVIS has sustained and will sustain future damages, including but not limited to costs of medical care; rehabilitation; home health care; mental and emotional distress; and pain and suffering.

371.    Defendants acted intentionally, recklessly, and wantonly without regard for Plaintiffs' rights beyond all standards of decency, entitling Plaintiffs to recover punitive damages.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## EIGHTH CAUSE OF ACTION
## LOSS OF CONSORTIUM

(Against Exactech Defendants and TPG Defendants[9])

372.   Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

373.   Plaintiff MARY DAVIS is, and at all times herein mentioned was, the lawful spouse of Plaintiff DAN DAVIS.

374.   As a direct, legal, and proximate result of the culpability and fault of Defendants, be such fault through strict liability, negligence, or other cause of action set forth herein, Plaintiff MARY DAVIS suffered and continues to suffer the loss of support, service, love, companionship, affection, society, intimate relations, and other elements of consortium, all to her general damage in an amount in excess of the jurisdictional minimum of this Court.

375.   As alleged above, Defendants knew and had reason to know that the Optetrak Devices caused an increased risk of harm to Plaintiff DAN DAVIS, and other consumers like him, and to Plaintiff MARY DAVIS, and other spouses like her.

376.   Defendants consciously disregarded this increased risk of harm by failing to warn of such risks; unlawfully concealing the dangerous problems associated with implantation of the Optetrak Devices; and continuing to market, promote, sell and defend the Optetrak Devices.

---

[9] Plaintiffs' claims against TPG Defendants are based on the general concepts of successor liability and piercing the corporate veil and include without limitation any similar doctrines for imposing liability on affiliated companies that may be available under governing law.

377.     Defendants' conduct, as alleged above, was oppressive, malicious, wanton, and subjected Plaintiffs and others like them to cruel and unjust hardship, and constitutes a willful, conscious and wanton disregard for the rights and safety of others.  Such conduct warrants imposition of punitive damages.

WHEREFORE, Plaintiffs demand judgment against Defendants as hereinafter set forth.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, and severally, as follows:

a.     Judgment in favor of Plaintiffs and against all Defendants, for damages in such amounts as may be proven at trial;

b.     Compensation for both economic and non-economic losses, including but not limited to medical expenses, loss of earnings, disfigurement, pain and suffering, mental anguish, and emotional distress, in such amounts as may be proven at trial;

c.     Medical monitoring, including ongoing and future testing, evaluation, treatment, and surgeries arising from Defendants' devices and related conduct;

d.     Punitive and/or exemplary damages in such amounts as may be proven at trial;

e.     Attorneys' fees and costs;

f.     Interest; and

g.     Any and all further relief, both legal and equitable, that the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

Dated: _/2/22/2023_

Respectfully submitted,

By:_____

Edward Baker

Edward Baker (Bar No. 543077)
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Phone: (212) 355-9500
Fax: (212) 355-9592
Email: ebaker@lchb.com

Mark P. Chalos
Hannah R. Lazarz
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
222 2nd Avenue South, Suite 1640
Nashville, TN 37201-2379
Phone: (615) 313-9000
Fax: (615) 313-9965
Email: mchalos@lchb.com
Email: hlazarz@lchb.com

*Attorneys for Plaintiffs*

2896923.1